[No. D022878. Fourth Dist., Div. One. Sept. 20, 1995.]

DOROTHY L. JOHNSON et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SHEPPARD, MULLIN, RICHTER & HAMPTON et al., Real Parties in
Interest.

464

**COUNSEL**

McInnis, Fitzgerald, Rees & Sharkey, Thomas E. Sharkey, Donald A. Vaughn and Kevin M. Arnold for Petitioners.

No appearance for Respondent.

Gray, Cary, Ware & Freidenrich, David E. Monahan, Alexander H. Rogers and Terri P. Durham for Real Parties in Interest.

## OPINION

**HUFFMAN, Acting, P. J.**—The petition in this case seeks reversal of summary adjudication granted by the trial court in favor of attorney defendants as to the professional negligence and breach of fiduciary duty counts contained in a broader action by certain limited partners against attorneys and their client. The lawyers, Sheppard, Mullin, Richter & Hampton and Christopher B. Neils (hereafter collectively Neils) rendered legal advice to the general partner of a limited partnership invested in land in Hawaii. After the partnership was dissolved, the former limited partners brought suit against the general partner and Neils, claiming they had been defrauded in the transaction resulting in their buyout and the dissolution of the partnership.

Neils first presented his motion for summary adjudication some two years ago, contending that he owed no duty to the limited partners and hence could not be faulted by them for claimed malpractice. (Code Civ. Proc., § 437c, subd. (f).) The trial court agreed. In our first writ review of this matter we returned the case to the trial court, ruling that a number of factual issues existed which precluded summary resolution. (*Ronson* v. *Superior Court* (April 14, 1994 (Cal.App.)) No. D020090.) The Supreme Court denied review of our opinion, but ordered it depublished. (Order of July 14, 1994.) Upon renoticing of the motion, the trial court held a new hearing, heard additional evidence which had been developed since the time of the first hearing, noted and reviewed the areas of factual problems which we had identified, and concluded that based on its new evidence and its heightened scrutiny of same its original conclusion (which we had reversed) was indeed correct; it again granted summary adjudication in favor of Neils.

We now have before us the additional evidence generated since our last review; we have received additional extensive briefing from counsel, and we have benefited from oral arguments. Our initial opinion in this case identified several potential avenues of liability of Neils, all of which seemingly depended upon unknown facts, which led us to the conclusion that "the issue of professional liability of the attorney defendants to the limited partners cannot be resolved as a matter of law." Now, based on the added evidence and briefing, we are in a position to rule more definitively than was previously possible.[1] We are able to accept the trial court's conclusion of no potential for liability on two of the three theories advanced by the plaintiffs,

---

[1]This second review of the summary adjudication proceedings is theoretically governed to some extent by the rule of "law of the case" established by our first opinion (which though depublished remains stare decisis as to the parties). (*Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 [212 Cal.Rptr. 466, 696 P.2d 1308].) Additional facts having been before the

but remain unconvinced of the defendant attorneys' position on the third; hence we grant the petition to reverse the summary adjudication.

## FACTUAL BACKGROUND

Manchester Hawaii Properties, Ltd. (MHP) is the Hawaii partnership created for this venture. The general partner was Torrey Enterprises, Inc. (TEI), which was controlled by Douglas F. Manchester (Manchester). The limited partners purchased interests in the partnership as an investment and tax shelter. The sole asset of the partnership was a ground lease in an industrial park. MHP subleased its improved ground lease to AMFAC Corporation (AMFAC).

In 1989 the fee owner offered to sell the underlying fee to MHP. At about the same time AMFAC was negotiating, secretly, with the fee owner, as well as with MHP, to acquire a greater interest in the realty. When Manchester learned of the fee owner's intended offer he broke off negotiations with AMFAC and executed a purchase agreement listing his company, TEI, as the intended purchaser. Since the sales offer was limited to park lessees, however, a second purchase agreement, in May of 1989, was executed naming MHP as the purchaser.

The terms of purchase appeared very beneficial. The price was 40 percent below market value, and the rent collectible by MHP upon acquisition, and renegotiation, was 8.6 times that previously payable.

In June 1989 Manchester sent the limited partners a letter stating that their investment had run its course and that their tax consequences would now be adverse. The limited partners were given an opportunity to sell their interests to MHP and asked to contribute added capital if they elected not to sell. The letter did not reveal that (1) Manchester for the partnership had already committed to purchase the property, (2) the property was available exclusively to the partnership, (3) the rent had been increased, (4) the purchase price was very favorable, or (5) Manchester had granted himself as an individual the opportunity to buy the property from MHP if the limited partners did not contribute additional capital.

Meanwhile, in Hawaii, AMFAC was threatening to sue MHP for alleged breach of an oral agreement to sell the leasehold interest. Neils, who had

trial court, together with substantial additional briefing, we observe that the legal stage is differently set than it was the first time around. We therefore decline to base this second review of the matter upon determinations made in the first review (although we do not consciously render different conclusions except as warranted by the additional evidence adduced).

represented TEI and Manchester in other matters previously, was asked to assist in holding off the potential litigation until the partnership could obtain Hawaii counsel. Beginning May 31, 1989, as shown by billing records, Neils performed services for Manchester concerning the partnership's property acquisition and the potential AMFAC litigation. On June 9, 1989, Neils in a letter to AMFAC stated that he represented the partnership and its general partner. Neils was also active during this period in attempting to find Hawaii counsel for the partnership, succeeding in this endeavor on June 21, 1989. Work nevertheless continued by Neils for some period thereafter on the property acquisition by the partnership.

During a deposition of Manchester taken by AMFAC, the issue of his communications with the limited partners was highlighted, apparently causing Manchester to think that additional information should be disclosed. In July, Manchester requested Neils review the situation and advise as to whether added communications should be sent to the limited partners. Neils reviewed various documents, including Manchester's earlier letter to the limited partners, and also exemplar documents pertaining to the purchase of the limited partners' interests. Neils then prepared a form letter to be sent to the limited partners, the objective being to satisfy Manchester's fiduciary duties of full disclosure. Included was a proposed release form. Neils's covering letter included the following statements:

"I have prepared and enclose herewith for you a rough draft of further correspondence to each of the limited partners."

"Also some judgment is involved as to whether you want to ask the particular limited partner to sign a release, especially since that was not part of the document package that you sent out to each of them in early June. It is a bit complicated adding something to a deal unilaterally. I do not know whether the potential benefit of getting such a signed release is worth rocking the boat. . . ."

"In preparing them I have also been mindful of the general consensus to keep this new batch of documents as brief as possible. Obviously it would have been better to have been more complete in the first instance, and it makes it somewhat awkward to do so now. . . ."

Neils's draft documents included a demand for each limited partner to contribute substantial additional capital to MHP, notwithstanding his knowledge that there was no provision in the partnership agreement for such assessments. Thus the limited partners were faced with an option of either contributing large sums or accepting the buyout proposal. Neils's letter was

in the form of a working draft, with blanks to be filled in with information Neils did not possess. Manchester revised the draft, omitting certain information, and sent a copy to Neils asking for comment. Neils replied that the letter was "legally adequate." The letter was then sent to the limited partners under Manchester's letterhead, with no indication of Neils's participation in its preparation.

In response to the letters all of the limited partners except partner Ronson agreed to sell their interests. Manchester resolved Ronson's claims, allegedly upon the advice of Neils, by dissolution of the MHP partnership. Manchester eventually resold the property for $8.6 million. The limited partners then brought suit against Neils, Manchester, and others. Since our first opinion in this case, partner Ronson has settled his claim, resulting in the continuation of the action in the name of partner Johnson.

## LEGAL ISSUES AND DISCUSSION

As indicated previously, the trial court granted summary adjudication in favor of Neils upon the determination that Neils as a matter of law had no duty of care or professional loyalty to the limited partners. In our initial opinion in this case we identified three theories upon which Neils could be found to owe a duty to the limited partners. We noted that there was no written or oral agreement between the limited partners and Neils, and hence first asked whether a duty could be found not on the basis of a contractual attorney-client relationship but grounded in public policy requiring imposition upon an attorney of an obligation to a nonclient. The first argument supporting such duty might be called the *"Goodman* v. *Kennedy"* theory, standing for the proposition that in certain cases an attorney will be liable to an intended beneficiary of his work even without any contractual or privity relationship with the beneficiary. (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 343 [134 Cal.Rptr. 375, 556 P.2d 737].) The second argument made to assert a duty to a nonclient is the claim that when an attorney represents a fiduciary he accepts something of a proxy obligation to protect the rights of the beneficiary. (See *Morales* v. *Field, DeGoff, Huppert & MacGowan* (1979) 99 Cal.App.3d 307 [160 Cal.Rptr. 239].) The third theory of liability is based upon the argument that by representing the partnership an attorney assumes a duty of care, and an obligation to avoid conflicts of interest, not only to the partnership but to its partners. This concept, we believe, is not that of a duty toward a nonparty to the attorney-client relationship, but instead that partners are coclients with their partnership. This may be

phrased, as did the trial court in this case, as an "implied duty" to partners based upon representation of the partnership.[2]

## A. The "Goodman v. Kennedy" Theory

In *Goodman* v. *Kennedy, supra*, 18 Cal.3d 335, the alleged negligence of the attorney was in giving bad advice to his corporate client pertaining to registration of securities to be issued by the corporation. The plaintiff was a purchaser of the securities who was damaged because of actions the corporation took based on the negligent advice. The court referred to the potential liability of attorneys to third parties by quoting at length from its earlier decision in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]: " 'The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.' " (*Goodman* v. *Kennedy, supra*, 18 Cal.3d at pp. 243-343.) In *Goodman*, the Supreme Court noted that the cases which impose a duty in favor of a third party are those in which the purpose of retention of the attorney was for the specific objective of creating such benefit. In *Lucas* v. *Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], for instance, it was held that when an attorney is retained to draft a will, the document's very purpose is to create benefit for a legatee, and hence a duty is owed to the legatee even though the legatee and the attorney are not in privity of contract.

The attorney in *Goodman* was found to have no duty to the plaintiff, although his advice clearly resulted in damage to the plaintiff, because his retention by the corporate client was not for the purpose of benefiting the plaintiff.

The trial court, in accordance with our first opinion, reviewed the factors set forth in *Goodman* v. *Kennedy* and came to the conclusion that Neils had no duty to the limited partners because there was no "close connection" between his service for Manchester and the ultimate damage to

---

[2]For purposes of the hearing on the second summary judgment or adjudication motion, Neils assumes as fact that (1) he gave advice to TEI to enable it to discharge a fiduciary duty of disclosure to the limited partners; (2) Neils knew his draft letter would be provided to TEI as a starting point for its letter to the limiteds; and (3) *Neils had an attorney-client relationship with the partnership.*

the partners. We agree with this analysis, but would go further. We understand cases such as *Biakanja* v. *Irving, supra*, 49 Cal.2d 647 and *Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104 [128 Cal.Rptr. 901] to impose a duty to the third party beneficiary of legal services because that was the intention of the purchaser of the legal services —the party in privity. Thus, imposition of the duty carries out the prime purpose of the contract for services. Here it was obviously not Manchester's intention to benefit the limited partners via the advice and services he solicited from Neils. In fact, Manchester's objective (giving credence to the plaintiffs' evidence) was quite to the contrary. We therefore cannot point to the principles reviewed in *Goodman* v. *Kennedy* as imposing any duty on Neils to protect the interests of the limited partners: he was not hired to do that. In the *Goodman* v. *Kennedy* line of cases the fault giving rise to liability is failure to perform adequately the service for which the attorney was retained (failing in *Lucas* v. *Hamm, supra*, 56 Cal.2d 583 for instance, to draw the will correctly). Here there is no contention that Neils did not perform the service for which Manchester hired him—indeed, the contention is that he performed too well, assisting Manchester in his purpose of swindling his partners. We can therefore find no basis for liability on this theory.

### B. *Duty Based on Fiduciary Representation*

The argument here starts with the undeniable proposition that Manchester and the general partner he controlled, TEI, had fiduciary obligations to the limited partners. Since Neils knew of this relationship, and knew that he was giving advice to Manchester to permit Manchester to discharge his fiduciary obligations, it is contended that Neils assumed concomitant fiduciary duties as respects the limited partners. The foundation for this argument is *Morales* v. *Field, DeGoff, Huppert & MacGowan, supra*, 99 Cal.App.3d 307. In that case a beneficiary of a trust sued the attorney for the trustee for allegedly representing both the trustee and a third party dealing with the trust—a conflict of interest which the plaintiff contended resulted in damage to her interests as beneficiary. The appellate court reversed the sustaining of a demurrer in favor of the attorney. It held that when an attorney undertakes to provide advice to a trustee, "he in reality also assumes a relationship with the beneficiary akin to that between trustee and beneficiary." (*Id.* at p. 316.) Thus finding a duty on the part of the attorney to the beneficiary, the court concluded that his improper dual representation constituted a tort actionable by the beneficiary.

Referring to this concept in our first opinion, we suggested that because a purpose of Neils's advice to Manchester was to provide guidance in the

performance of his fiduciary obligations "[Neils] may have undertaken some kind of duty to protect those interests."

A review of the facts highlighted in the trial court's current ruling convinces us that the potential duty we speculated might exist did not in fact come into being. As the trial court noted, Neils had no direct contact whatever with the limited partners. Neils had no knowledge of the net worth or financial resources of the limited partners. The limited partners did not know of the services rendered by Neils and certainly did not rely on his advice. Neils had no confidential information concerning the limited partners.

The authorities since *Morales* v. *Field, DeGoff, Huppert & MacGowan, supra,* 99 Cal.App.3d 307, while not directly taking exception to the rule of the case, appear to have held uniformly that the legal representation of a fiduciary, standing alone, does not impose upon the attorney a fiduciary obligation to the beneficiary. A clear statement of this proposition was made by our court in *Goldberg* v. *Frye* (1990) 217 Cal.App.3d 1258, 1268-1270 [266 Cal.Rptr. 483] (without benefit of citation to or distinction of *Morales* v. *Field*). Also, cases since *Morales* v. *Field* have distinguished (1) the situation of representation of interests of the fiduciary and his beneficiary when the interests are not in conflict, and (2) that in which the fiduciary seeks advice as to actions which will be in conflict with the interests of the beneficiary. In *Schick* v. *Lerner* (1987) 193 Cal.App.3d 1321 [238 Cal.Rptr. 902], for instance, the court held that an attorney retained by a psychologist had no duty of care to the psychologist's patient in terms of advice relative to the revelation of confidential information, because the attorney was retained to assist his psychologist client in dealing with an adversarial situation. (*Id.* at p. 1330.) Similarly, in *Skarbrevik* v. *Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692 [282 Cal.Rptr. 627] it was held that an attorney for a corporation had no duty to a minority shareholder, even though the majority shareholders had a fiduciary obligation to the minority shareholder, because the minority's interests were deemed to be adverse to the client the attorney was advising—the majority. (See also *Hoiles* v. *Superior Court* (1984) 157 Cal.App.3d 1192 [204 Cal.Rptr. 111].)

We note further that facts existed in *Morales* v. *Field* suggestive of creation of a fiduciary duty to the beneficiary in addition to the mere existence of advice by an attorney to a fiduciary. The attorneys had communicated with the beneficiary stating that no further action on her part need be taken, that " 'we will keep you advised if anything unusual arises' " and that " 'you should feel reasonably assured that your interests will be protected.' "

(*Morales* v. *Field, DeGoff, Huppert & MacGowan, supra,* 99 Cal.App.3d at p. 312.) Hence, there existed in *Morales* facts suggesting the undertaking of an obligation of care by the attorneys, apart from their representation of their direct client, the fiduciary.

We question whether an attorney who undertakes to represent a trustee or other fiduciary, by that fact alone, assumes a duty the breach of which will be actionable directly by the beneficiary. Even if such proposition can be supported generally, it cannot apply in a situation in which the interests of the fiduciary and the beneficiary are adverse. That was the situation in Manchester's case. Accordingly, Neils was entitled, in our view, to give Manchester advice without being concerned with a potential duty to the limited partners, *insofar as that duty might be conceived to arise solely from the existence of a fiduciary duty on TEI's or Manchester's part to the limited partners.*

C. *Implied Duty Based on Partnership Representation*

The trial court, in its review of the evidence, agreed that Neils's representation of Manchester in May through July 1989 was adverse to the interests of the limited partners (or at least that the evidence might be so construed by a finder of fact). Accordingly, the trial court evidently would agree that this representation would have been improper and actionable under rule 3-310(C) of the California Rules of Professional Conduct *if* it could be said that Neils had ever established an attorney-client relationship with the limited partners. (See fn. 6, *post.*) Based upon the lack of direct contact between Neils and the limiteds, their lack of reliance on his advice, and the fact that attorney fees paid to Neils apparently did not come from the interests of the limited partners, the trial court found no attorney-client relationship ever to have existed, and hence rendered summary adjudication in favor of Neils.[3]

We first review the authorities on this subject. A proper start in this effort is *Wortham & Van Liew* v. *Superior Court* (1987) 188 Cal.App.3d 927 [233 Cal.Rptr. 725] (*Wortham*). The case involved efforts by one partner to discover communications by another partner to the partnership's attorney. Our court held that ". . . partners owe to one another, and general partners owe to limited partners, obligations of good faith, fair dealing." (*Id.* at p. 932.) This obligation imposed reciprocal rights and duties of access to all information bearing on partnership business, and precluded one partner's

---

[3]At this point, the causes of action alleged against Neils were professional negligence, breach of fiduciary duty, constructive fraud, and conspiracy.

raising the attorney-client privilege to bar revelation of partnership communications. In the course of this opinion we wrote, "In the context of representation of a partnership, the attorney for the partnership represents all the partners as to matters of partnership business." (*Ibid.*) If this broad statement can be sustained, then Neils had an attorney-client relationship with the limited partners because it is stipulated that for a period of at least two or three months, Neils represented MHP, the limited partnership, and in fact counseled on matters of general interest to the partnership and its partners.

Neils relies principally upon two cases (an old Supreme Court decision and a recent Court of Appeal case) to contend that representation of a partnership does *not*, absent unusual facts, create an attorney-client relationship with the limited partners. The Supreme Court decision is *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179 [242 Cal.Rptr. 196, 745 P.2d 917]. This was a review of a disciplinary proceeding in which the Attorney Kapelus was accused of violation of professional ethics by representation of conflicting interests. He had engineered the creation of a charitable entity and separate business partnerships which engaged in transactions with the charity. Kapelus served both as general partner and attorney for the business partnerships, and the State Bar contended that his acquisition of an interest therein and his taking of positions contrary to the interest of the limited partners constituted a conflict of interest. The Supreme Court assumed that Kapelus as general partner owed fiduciary duties to the limited partners, but concluded that this relationship in and of itself did not create an attorney-client relationship between Kapelus and the limited partners. This conclusion apparently was reached upon the finding by the court that ". . . there is no evidence that any of the limited partners ever sought [Kapelus's] professional advice or attempted to establish an attorney-client relationship with him. . . . [A]t least on the facts of this case we do not believe that the 'general partner/limited partner' connection was sufficient to create an attorney-client relationship between [Kapelus] and the individual investors." (*Id.* at p. 192.)

The Court of Appeal authority is *Responsible Citizens* v. *Superior Court* (1993) 16 Cal.App.4th 1717 [20 Cal.Rptr.2d 756] (*Responsible Citizens*). The court reviewed the trial court's order disqualifying certain attorneys from representation of Responsible Citizens, a public interest entity which had brought action to stop a mining project. The project's principal was David Askins. The attorneys in an unrelated legal matter had represented Westside Land Office, a real estate brokerage firm, in which Karen Askins, wife of David, was a partner. Both Karen and David were named as parties in the action to stop the mining project. The trial court concluded that representation of Westside constituted the creation of an attorney-client

relationship with Westside's partners, including Karen, with the result that subsequent representation in an action against Karen was a conflict of interest. (*Id.* at pp. 1721-1723, 1734-1735.)

The Court of Appeal reversed, and in so doing wrote an opinion which is instructive for our purposes. It noted that our *Wortham* opinion, *supra*, 188 Cal.App.3d 927 rested upon the premise that the attorney's representation of the individual partners pertained " 'to matters of partnership business' and to assisting the partner in fulfilling 'his joint management duties.' " Our case was also distinguished on the ground that it related to privilege, as distinguished from conflict of interest. (*Responsible Citizens, supra,* 16 Cal.App.4th at pp. 1727, 1728.) The conclusion, therefore, was that as applied to the *Responsible Citizens* fact situation, *Wortham* did not require classification of Karen as a client except for matters within the sphere of the partnership business (which the mining project was not).

The court discussed whether a partnership should be treated as an "entity" (hence representation would not imply an attorney-client relationship with the individual partners) or an "aggregate" (which would imply representation of all partners). This question was seemingly relevant in terms of Rules of Professional Conduct, rule 3-600(A), which provides that when an attorney represents an "organization," the client is the organization itself rather than its officers or members. (*Responsible Citizens, supra,* 16 Cal.App.4th at p. 1729.) The court found, however, that the answer to this question was not dispositive, since even though representation of a partnership might ordinarily be simply representation of the entity, individual facts and circumstances might produce a different result. There is no bright line, said the court, indicating that ". . . a partnership attorney *always* represents the partners, or that he or she *never* does." (*Id.* at p. 1731.)

■ What, then, are the factors which would determine whether in a particular case the partnership attorney has established an attorney-client relationship with the individual partners? As we construe *Responsible Citizens,* these factors were identified as follows (the court there noting that they are admittedly not "exhaustive"):

1. The size of the partnership. The argument is that representation of a partnership of few members may suggest an individual representation of the members, while representation of a partnership with "scores or even hundreds" of partners would not. (*Responsible Citizens, supra,* 16 Cal.App.4th at pp. 1732-1733.)

2. The nature and scope of the attorney's engagement. In *Responsible Citizens* the attorneys' engagement for the Westside partnership appears to

have been for routine partnership business, unrelated to the individual interests of Karen Askins, thus negating an implication of individual representation.

3. The kind and extent of contacts between the attorneys and the individual partners.

4. The attorney's access to financial information relating to the individual partner's interests. (*Responsible Citizens*, *supra*, 16 Cal.App.4th at p. 1733.)

5. "[P]rimary attention should be given to whether the totality of the circumstances, including the parties' conduct, implies an agreement by the partnership attorney not to accept other representations adverse to the individual partner's personal interests." (*Responsible Citizens*, *supra*, 16 Cal.App.4th at p. 1733.)

We accept the pronouncements of *Kapelus* v. *State Bar*, *supra*, 44 Cal.3d 179 and *Responsible Citizens*, which enunciate the principle that mere representation of a partnership does not per se constitute representation of the individual partners.[4] Our task, therefore, is to determine whether, following the guidelines of *Responsible Citizens*, we can conclude that the record contains sufficient facts to permit us to reach the conclusion, as a matter of law, that Neils had no attorney-client relationship with, and hence no duty to, the limited partners.[5] Whether an attorney-client relationship exists is a question of law. (*Responsible Citizens*, *supra*, 16 Cal.App.4th at p. 1733.) If the evidence of facts bearing upon this decision is in conflict, its resolution is to be made by the finder of fact. (*Ibid.*)

 We believe that the evidence bearing on the question of existence of the relationship in this case, at least insofar as presented in this pretrial motion, is not in dispute. We would note in this regard that almost all such evidence is based upon documents, correspondence and testimony of Manchester and Neils themselves, so it can hardly be deemed disputable by them. For the purposes of the motion, Neils assumes that he represented the

---

[4]We view this conclusion as not undermining the holding of *Wortham* which, we believe, can be narrowly construed to stand for the principle that all partners have a right to access to information and communications concerning partnership business, including communications with attorneys who are retained to give advice concerning partnership business.

[5]In reviewing a summary judgment we approach the record de novo, affirming a judgment for a defendant only if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 279 [36 Cal.Rptr.2d 537, 885 P.2d 950].)

partnership. No presentation of evidence has yet been made with respect to issues of causation, proximate causation and damage, and these issues remain open for trial. As for the issue of duty, however, we are in a position of being required to rule. The issue before us is not whether duty has been established, because no motion to that end was being made in the hearing we review. The issue is whether the undisputed facts before the court establish the lack of duty. The trial court answered this question in the affirmative. Reviewing the same facts, de novo, we reach the opposite conclusion.

This conclusion is based upon the following analysis of the *Responsible Citizens* factors. Weighing on the side of no attorney-client relationship is the fact that the limited partners did not know of Neils's representation and, at least in terms of their ignorance of his existence, did not rely on him. Neils had had no prior relationship of any kind with the limited partners, and was uninformed as to their individual financial positions or their desires with respect to continued investment in the partnership. Neils reasonably can be charged, however, with the knowledge that the limited partners probably knew little about Manchester's current negotiations with either the landlord or AMFAC. Also, it must be presumed that he expected the limited partners to rely upon the information contained in the letter he wrote and ultimately approved, and he must have realized the extent to which the letter as sent omitted mention of material facts.

The primary factor guiding us to a conclusion of the existence of an attorney-client relationship is the nature of representation that Neils rendered. It is undisputed (indeed stipulated) that Neils performed legal services and rendered legal advice to the MHP partnership with respect to its negotiations both with the landlord and with AMFAC. There is no question but that TEI or Manchester could have retained Neils to represent them solely in their adversarial negotiations with the limited partners. That is not, however, what happened. Neils was retained to represent partnership interests, generally; and at least to some substantial extent he performed this service. Regarding that service, in accordance with Rules of Professional Conduct, rule 3-600(A), his presumed client was MHP, the partnership, rather than either TEI or Manchester. Had Neils then performed services benefiting TEI or Manchester to the detriment of the partnership, it is clear that he would have violated his duty of care and loyalty to the partnership. The partnership would have had a cause of action against Neils, and failing the institution of such, the limited partners could have brought a derivative action (see Corp. Code, § 15702 [limited partners may bring derivative action on behalf of partnership when general partner refuses to act]) or a direct action in equity (see *Prince* v. *Harting* (1960) 177 Cal.App.2d 720,

736-737 [2 Cal.Rptr. 545]; also see 9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership, § 36, p. 433).

Assuming, then, the appropriation of a partnership opportunity by Manchester, and the discovery of such by the limited partners, recourse would have been available both against Manchester and against Neils. Can these parties avoid this eventuality by means of purchasing the interests of the limited partners and *then* dissolving the partnership to the ultimate benefit of Manchester and his wholly owned TEI? We think not.

This is a case, we are convinced, in which the undertaking by Neils to represent the partnership, generally, imposed upon him an obligation of loyalty to the partnership and to all partners in terms of their entitlement to benefits from the partnership. Whether this constituted Neils an attorney, literally, for the individual limited partners, is of no great moment. He had a duty to the partnership to look out for all the partners' interests, and if this could not be accomplished because of conflicts of interest among them he had a duty to terminate the representation (or obtain appropriate waivers of the conflict).[6] The evidence before us, if established at trial, is sufficient to permit a finding that this duty existed. A breach of it vested the partnership with an action against Neils, which the limited partners are entitled to bring, either in their own right or on a derivative theory. The summary adjudication removing Neils and his law firm as defendants in these causes of action should therefore not have been granted.

## DISPOSITION

The petition is granted. Let a writ of mandate issue directing respondent court to vacate its order granting summary adjudication, and to conduct such further proceedings as necessary as are consistent with our determination that if the facts presented on summary adjudication are proved at trial, an attorney-client duty toward the limited partners exists, while triable material

---

[6]Rules of Professional Conduct, rule 3-310 governs "Avoiding the Representation of Adverse Interests." Subdivision (B) provides that an attorney shall not accept or continue representation of a client under specified circumstances involving dual representation (including where there is an existing professional relationship with another party in the same matter), without written disclosure of the circumstances and the actual or foreseeable adverse consequences of such representation. Similarly, subdivisions (C) and (E) require an attorney who accepts or continues representation of more than one client to obtain the informed written consent of each of these clients if their interests actually or potentially conflict, or where confidential information has been obtained. Moreover, circumstances may also arise affecting the duty of loyalty so that ". . . the ethical obligation to withdraw from further representation of one of the parties is mandatory, rather than subject to disclosure and client consent." (*Flatt v. Superior Court, supra,* 9 Cal.4th at p. 282; see also Mallen & Smith, Legal Malpractice (3d ed. 1989) § 13.27, pp. 808-810.)

issues of fact remain as to the breach, causation, and damages issues. The stay of proceedings heretofore imposed is vacated. Petitioners are entitled to their costs incurred in this writ proceeding.

Froehlich, J.,* and Nares, J., concurred.

A petition for a rehearing was denied October 18, 1995.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.