Filed 9/23/13  Rikuo Kotsu Co., Ltd. v. Carlsmith Ball, LLP CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RIKUO KOTSU CO., LTD., | B238598 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC446562) |
| v. | |
| CARLSMITH BALL, LLP, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Abraham Kahn, Judge.  Affirmed.

Greene, Broillet & Wheeler, Bruce A. Broillet, Scott H. Carr, Alan Van Gelder; Esner, Chang & Boyer and Andrew N. Chang, for Plaintiff and Appellant.

Keesal, Young & Logan, Samuel A. Keesal, Jr., Ben Suter and Elyse W. Grant, for Defendants and Respondents.

_____

Rikuo Kotsu Co., Ltd., the parent of Rikuo Corporation (RC) and Pacific Kingland Corporation (PKC), appeals from the dismissal of its legal malpractice and other tort claims against Carlsmith Ball LLP and its former partner Kenji Tatsugi, who had represented RC and PKC in litigation with Rikuo Kotsu over control of the subsidiary corporations. In this action Rikuo Kotsu alleges Carlsmith Ball and Tatsugi aided and abetted the looting of Rikuo Kotsu, RC and PKC by Rikuo Kotsu founder Whoe Joon Han, his mistress Nung Ja Hwang and her son Kwan Koo Lee. The trial court sustained the demurrers filed by Carlsmith Ball and Tatsugi on the ground Rikuo Kotsu had never been a client of the law firm and, absent any duty to Rikuo Kotsu, the firm could not be liable for fraudulent concealment. The court also ruled Rikuo Kotsu's aiding and abetting tortious conduct claims failed as a matter of law under the "agent's immunity rule" enunciated in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 (*Doctors' Co.*) and rejected its conversion claim. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Underlying Action: Rikuo Kotsu Co. v. Rikuo Corp. et al.*

In a statement of decision appended to the first amended complaint in this action, the Honorable Robert L. Hess made the following findings that describe past dealings between the parties: Han was the founder, largest shareholder and controlling person of Rikuo Kotsu, a closely held Japanese company. For almost four decades he dominated the management of Rikuo Kotsu to the extent his directions were accepted without question and without documentary or corporate formalities. Although Han's wife and family lived in Japan, Hwang became his mistress; and they lived together in Han's California residence.

In the early 1980's Han decided to diversify Rikuo Kotsu's business by acquiring California real estate and created RC as the vehicle for this purpose. RC was capitalized by funds transferred from Rikuo Kotsu at Han's direction; and shares were issued in the name of Rikuo Kotsu. Although Hwang and Lee were purportedly issued shares in RC to qualify for United States visas, they never contributed capital or services as consideration for these shares. Han also purported to transfer Rikuo Kotsu's shares in RC to himself

2

personally but hid these and other transactions from Rikuo Kotsu. From 1982 to at least 1994 Rikuo Kotsu, at the direction of Han, loaned RC amounts in excess of $37 million.

PKC was formed in late 1990 to hold real estate in Hawaii. Like RC, the money for its capitalization came from Rikuo Kotsu, and shares were issued in Rikuo Kotsu's name. Neither company observed required corporate formalities although at some point Hwang was made president of PKC. Lee assumed a position with RC, and, together, Hwang and Lee succeeded in diverting substantial assets for their personal benefit.

In early 1998 Rikuo Kotsu began having financial problems because of the cash diverted by Han to the subsidiary corporations. Han, however, refused to disclose the status of the United States-based assets. In March 2002, at the insistence of the Japanese government and Rikuo Kotsu's creditors, Han was forced to resign his position at Rikuo Kotsu. His stock was transferred to his daughter, who also took over his official position with Rikuo Kotsu.

In 2002 Han developed health problems and took a less active role with the subsidiaries. Hwang, aided by Lee, used her influence over Han to direct transfers of RC assets and to extinguish security interests held by Rikuo Kotsu. The proceeds of these transactions were diverted for the personal benefit of Han, Hwang and Lee. By 2004 Han had developed Alzheimer's disease and was found to be mentally incompetent. Nonetheless, he executed a power of attorney in favor of Hwang and Lee, who proceeded to liquidate RC and PKC assets for their own benefit.

Rikuo Kotsu sued Han, Hwang, Lee and the two subsidiaries in October 2004 seeking damages and equitable relief. In May 2008 Judge Hess, ruling after a lengthy bench trial, found Rikuo Kotsu to be the sole shareholder of RC and PKC, ordered an accounting and awarded more than $37 million in damages, plus interest, to Rikuo Kotsu based on documented loans the company had made at the direction of Han to its subsidiaries.

2. *The Instant Action Against Carlsmith Ball and Tatsugi*

In September 2010 RC, PKC and Rikuo Kotsu sued Carlsmith Ball and Tatsugi alleging causes of action for legal malpractice, breach of fiduciary duty, fraud and aiding

3

and abetting tortious conduct. After the trial court sustained Carlsmith Ball and Tatsugi's demurrers to the complaint, RC, PKC and Rikuo Kotsu filed a first amended complaint asserting the same causes of action and a fifth cause of action for conversion.

In support of these causes of action, the first amended complaint alleges Hwang and Lee, who posed as officers and directors of RC and PKC, retained Tatsugi, a former classmate of Lee's, and Carlsmith Ball to represent them. Carlsmith Ball represented Han, Hwang, Lee, RC and PKC in multiple matters, including the defense of the underlying action, as part of a scheme to loot assets that rightfully belonged to Rikuo Kotsu as sole shareholder of RC and PKC. The actions attributed to Carlsmith Ball include the inducement of Han to execute a power of attorney and other corporate resolutions designed to allow Hwang and Lee to transfer or liquidate assets for their own benefit and to pay the firm's fees. Carlsmith Ball also allegedly assisted Lee and Hwang with the release of liens on various properties, the procurement of loans to Hwang and Lee using as collateral assets owned by PKC, the creation of shell corporations to facilitate the liquidation of assets and the sale of a Learjet notwithstanding Rikuo Kotsu's security interest. Finally, after assisting Lee and Hwang in looting RC and PKC, Tatsugi and Carlsmith Ball took steps to conceal their wrongful conduct. Tatsugi and Carlsmith Ball knew or should have known that Lee and Hwang had no authority to act on behalf of RC or PKC and that Rikuo Kotsu was the sole shareholder of RC and PKC. Based on these allegations, Rikuo Kotsu alleged it was a third party beneficiary of the attorney-client relationship between RC and PKC with Carlsmith Ball and Tatsugi and the attorney defendants breached their duties to Rikuo Kotsu and fraudulently concealed material facts from the company.

The trial court sustained Carlsmith Ball and Tatsugi's demurrer to all of Rikuo Kotsu's claims without leave to amend. The court overruled the demurrers of RC and PKC except as to the fifth cause of action for conversion, which it sustained without leave to amend. Judgment of dismissal as to Rikuo Kotsu was entered on December 1, 2011.

4

**DISCUSSION**

1. *Standard of Review*

On appeal from an order dismissing an action after the sustaining of a demurrer without leave to amend, we independently review the pleading to determine whether the facts alleged state a cause of action under any possible legal theory.  (*McCall v. PacifiCare of Cal.*, *Inc.* (2001) 25 Cal.4th 412, 415; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)  We may also consider matters that have been judicially noticed.  (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; see *Serrano v. Priest* (1971) 5 Cal.3d 584, 591.)  We give the complaint a reasonable interpretation, "treat[ing] the demurrer as admitting all material facts properly pleaded," but do not "assume the truth of contentions, deductions or conclusions of law."  (*Aubry,* at p. 967; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126; see *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 20 [demurrer tests sufficiency of complaint based on facts included in the complaint, those subject to judicial notice and those conceded by plaintiffs].)  We liberally construe the pleading with a view to substantial justice between the parties.  (Code Civ. Proc., § 452; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

2. *The Absence of an Attorney-client Relationship Between Carlsmith Ball and Rikuo Kotsu Is Fatal to Its Legal Malpractice and Breach of Fiduciary Duty Claims*

"To state a cause of action for legal malpractice, a plaintiff must plead '(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence.'" (*Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 693, quoting *Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199; see *Goldberg v. Frye* (1990) 217 Cal.App.3d 1258, 1267 ["[a] key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant"]; *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959 [absence of an attorney-client relationship is fatal to a legal malpractice claim].)  "Whether an

5

attorney sued for malpractice owed a duty of care to the plaintiff 'is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances.'" (*Martorana,* at p. 693, quoting *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 342 (*Goodman*); accord, *Skarbrevik v. Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 701 (*Skarbrevik*).)

Rikuo Kotsu contends, as the parent of its wholly owned subsidiaries RC and PKC, Carlsmith Ball was effectively Rikuo Kotsu's lawyer and owed the company the same duty owed to its client subsidiaries. However, as other courts have recognized, the notion that an attorney could be liable for malpractice to an adversary of his own client is "'fraught with illogic.'" (*Baum v. Duckor* (1999) 72 Cal.App.4th 54, 67, fn. 6.) "An attorney representing a corporation does not become the representative of its stockholders merely because the attorney's actions on behalf of the corporation also benefit the stockholders; as attorney for the corporation, counsel's first duty is to the corporation." (*Skarbrevik, supra,* 231 Cal.App.3d at p. 703.) "[C]orporate counsel's direct duty is to the client corporation, not to the shareholders individually, even though the legal advice rendered to the corporation may affect the shareholders." (*Id*. at p. 704.) "[E]ven where there is but one course of action for an attorney to follow, the attorney must be free from the threat of potential liability in order to devote undivided loyalty to the client. . . . If an attorney is saddled with a duty to a potentially adverse party, then his loyalty to the client cannot be undivided." (*Major Clients Agency v. Diemer* (1998) 67 Cal.App.4th 1116, 1124-1125; accord, *Baum,* at p. 66 ["'If an attorney perceives that his current adversary might some day be entitled to sue him for malpractice, he may be reluctant to pursue vigorously the current litigations for fear of providing motivation (i.e., his adversary's wrath) for a later malpractice action. Such a damper on the attorney's zeal also undermines the client's trust in his attorney, because the client could well question whether the attorney was making tactical choices based solely on the client's best interests.'"].)

In this case there was not simply the potential for adversity between Rikuo Kotsu and its subsidiaries, the parties actually became litigation adversaries in October 2004

6

when Rikuo Kotsu filed the underlying lawsuit against RC and PKC.  As a result, the California Rules of Professional Conduct barred Carlsmith Ball attorneys from even communicating with Rikuo Kotsu or any of its officers about the subject of the litigation.  (See Rules Prof. Conduct, rule 2-100(A); see also rule 3-310 [avoiding the representation of adverse interests].)

Rikuo Kotsu's alternative contention it was a third party beneficiary of the services provided to RC and PKC fails for similar reasons.  "An attorney has no duty to protect the interests of an adverse party [citations] for the obvious reasons that the adverse party is not the intended beneficiary of the attorney's services, and the attorney's undivided loyalty belongs to the client."  (*Fox v. Pollack, supra,* 181 Cal.App.3d at p. 961; see *Johnson v. Superior Court* (1995) 38 Cal.App.4th 463, 471 ["the cases impos[ing] a duty in favor of a third party are those in which the purpose of retention of the attorney was for the specific objective of creating such benefit"].)  "An essential predicate for establishing an attorney's duty of care under an 'intended beneficiary' theory is that *both* the attorney . . . and the client . . . must have intended [the third party] to be a beneficiary of legal services [the attorney] was to render."  (*Zenith Ins. Co. v. Cozen O'Connor* (2007) 148 Cal.App.4th 998, 1008; see *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 832.)  As the *Zenith* court explained, "California law is settled that a client's subjective belief that an attorney-client relationship exists, standing alone, cannot create such a relationship, or a duty of care owed by the attorney to that plaintiff.  [Citation.]  This is because a plaintiff cannot unilaterally establish an attorney-client relationship, and its hindsight 'beliefs' that such a relationship existed are thus legally irrelevant.  [Citation.]  Instead, it is the intent and conduct of the parties that control the question as to whether an attorney-client relationship has been created."  (*Zenith,* at p. 1010; see also *B.L.M.,* at p. 832 [mere fact that developer stood to benefit from project's successful completion did not make developer a third party beneficiary of an employment agreement between a city and the law firm that acted as bond counsel for the project].)

7

Rikuo Kotsu's allegations thus fall short of establishing the attorney-client relationship necessary to support its legal malpractice claim. As Carlsmith Ball points out, if it were found to have such a duty to Rikuo Kotsu, "every time a corporation waged and won a contest for corporate control, the losing corporation's attorney would be adjudged to have retroactively owed a duty to the corporation to which it was adverse and against which it had been retained to defend its client."

Just as inevitably, Rikuo Kotsu's breach of fiduciary duty claim fails because the company has not alleged facts supporting the existence of a fiduciary relationship with Carlsmith Ball or Tatsugi other than that of an attorney to a client. (See *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.)

3. *Rikuo Kotsu's Fraud Claim Fails for Lack of a Duty of Disclosure*

According to Rikuo Kotsu, "[t]he crux of [its] suit . . . is defendants' participation in the fraudulent scheme" to loot the parent corporation. In support of an alternative theory of tort liability, Rikuo Kotsu alleges Carlsmith Ball and Tatsugi fraudulently failed to disclose material facts that misled the company to its detriment.

"'[T]he elements of a cause of action for fraud based on concealment are: "'(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.'"'" (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 850; accord, *Jones v. ConocoPhillips* (2011) 198 Cal.App.4th 1187, 1198.) Generally, "[a] fraud claim against a lawyer is no different from a fraud claim against anyone else. '"If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability."' [Citations.] While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud.

8

[Citation.] Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient [citation] and may be liable to a nonclient for fraudulent statements made during business negotiations." (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 (*Vega*); see also *Favila v. Katten Muchin Rosenman LLP* (2010) 188 Cal.App.4th 189, 209 ["an attorney has 'an independent legal duty' not to defraud individuals engaged in business transactions with his or her client"]; *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 84 [plaintiffs permitted to sue attorney for conspiring with insurance company to commit actual fraud because attorney "had a duty to refrain from injuring [plaintiffs] through express misrepresentation"]; *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 202 ["the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length"].) "Active concealment or suppression of facts by a nonfiduciary 'is the equivalent of a false representation, i.e., actual fraud.'" (*Vega,* at p. 291.)[1]

The first amended complaint, however, does not identify any false representations or active concealment of material facts by lawyers at Carlsmith Ball to Rikuo Kotsu or any of its agents. To the contrary, the critical allegations leveled at Carlsmith Ball and Tatsugi simply allege the lawyers failed to disclose material facts and offer no basis for the inference of a duty on the part of the lawyers to disclose those facts to Rikuo Kotsu.[2]

---

[1]    In *Vega* a shareholder sued a law firm that had represented a company trying to merge with the shareholder's business. The shareholder alleged the law firm had concealed the unfavorable terms of a financing transaction involving its client to deceive the shareholder into exchanging his stock in the merger. (*Vega, supra,* 121 Cal.App.4th at p. 287.) The court determined the law firm's concealment of the unfavorable terms was actionable because it had expressly undertaken to disclose the terms of the financing transaction to the plaintiff shareholder. Accordingly, the law firm was not entitled to conceal a material term by providing a "sanitized" version of the financing to the shareholder's attorneys during the acquisition. (*Id.* at p. 292.)

[2]    The first amended complaint alleges Carlsmith Ball and Tatsugi failed to disclose they "would not represent [Rikuo Kotsu] in an honest, ethical and transparent manner" (an allegation irrelevant to Rikuo Kotsu, which had no attorney-client relationship with Carlsmith Ball); failed to disclose "they would take actions designed or intended to

9

Consequently, Carlsmith Ball and Tatsugi bore no duty of disclosure to Rikuo Kotsu and did not assume such a duty by making misleading or incomplete statements on which Rikuo Kotsu could have reasonably relied.

4. *Rukio Kotsu's Aiding and Abetting Tortious Conduct Claim Also Fails as a Matter of Law*

"California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. '"Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person."'" (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144; accord, *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 879.) "Mere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting. [Citation.] 'As a general rule, one owes no duty to control the conduct of another . . . .'" (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1326; accord, *Austin B.,* at p. 879.) Aiding and abetting "'necessarily requires a defendant to reach *a conscious decision to participate in tortious activity* for the purpose of assisting another in performing a wrongful act.'" (*Casey,* at p. 1146.)

California law makes it exceedingly difficult to successfully plead an aiding and abetting claim against an attorney who does not otherwise owe a duty to the plaintiff. In *Doctors' Co., supra,* 49 Cal.3d 39 the Supreme Court "articulated the basic rule that a

operate to the detriment of [Rikuo Kotsu]" (while engaged as counsel to Rikuo Kotsu's litigation adversaries); failed to disclose "they would place the interests of other clients, including Han, Hwang and Lee above those [of Rikuo Kotsu] (again inapplicable to non-client Rikuo Kotsu); failed to disclose "they would place their own financial interests above those of [Rikuo Kotsu]" and "would attempt to cover up wrongful acts"; failed to disclose they would secure loans on behalf of Hwang and/or Lee," "sell or transfer property to benefit Hwang and/or Lee," "aid, abet, assist and/or conspire with Han, Hwang and/or Lee to loot the assets of [Rikuo Kotsu]," prepare and file "fraudulent paperwork" and "assist Hwang and/or Lee in creating shell corporations to the detriment of [Rikuo Kotsu]."

conspiracy cause of action cannot lie 'if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty.'" (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 391, quoting *Doctors' Co.*, at p. 44.)  Known as the "agent's immunity rule," this doctrine has few exceptions, the most significant of which is when the agent participates in the breach of duty owed by the client for his or her own personal financial advantage.  (See *Doctors' Co.,* at p. 45; accord, *Berg & Berg Enterprises LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 826 (*Berg*); *Skarbrevik, supra,* 231 Cal.App.3d at p. 710.)[3]  Clearly, "[t]he relationship of attorney and client is one of agent and principal" *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, supra*, 107 Cal.App.4th at p. 69); thus, applying the agent's immunity rule, courts have consistently rejected claims alleging the requisite financial advantage arising solely from an attorney's receipt of fees for the services provided to the client.  (See *Berg,* at p. 834; *Skarbrevik,* at p. 710; see also *Neilson v. Union Bank of California, N.A.* (C.D. Cal. 2003) 290 F.Supp.2d 1101, 1122 ["California courts uniformly hold that ordinary fees, even fees calculated on the basis of the amount of assets held in an account, do not satisfy the 'personal gain or financial advantage' requirement"]; *Berg,* at p. 835 ["[t]he purpose of this limitation on the 'financial advantage' test . . . is to protect employees and agents of a principal against the

_____

[3]     Virtually all other exceptions to the agent's immunity rule derive not from the agency relationship but from a court's identification of an attorney's independent duty to the plaintiff.  (See *Berg, supra,* 131 Cal.App.4th at p. 834 ["the second part of the exception in a sense defines the first in that it suggests that the attorney's exceptional conduct that is outside the performance of his or her duties to the client are those activities that are taken in furtherance of the attorney's own financial advantage"]; accord, *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 592; *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 1107; see also *Neilson v. Union Bank of California, N.A.* (C.D. Cal. 2003) 290 F.Supp.2d 1101, 1124-1125.)

11

imposition of vicarious liability for aiding and abetting or conspiracy for the mere fact of their paid employment"].)[4]

The first amended complaint alleges only that Carlsmith Ball and Tatsugi performed legal services for their clients and principals (Han, Hwang, Lee and the subsidiaries) they knew or should have known would breach duties owed by the clients to Rikuo Kotsu. These allegations are insufficient to state a cause of action for aiding and abetting tortious conduct against Carlsmith Ball and Tatsugi.

5. *Rikuo Kotsu's Cause of Action for Conversion Fails*

Conversion is the wrongful exercise of dominion over the personal property of another. (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 119.) The elements of a conversion action are "'"the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages. It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use."'" (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1507; accord, *Haro v. Ibarra* (2009) 180 Cal.App.4th 823, 835.)

As Rikuo Kotsu argues, a cause of action for conversion does not require the plaintiff to predicate liability on the existence of a duty; it simply requires the plaintiff to demonstrate the defendant wrongfully assumed control over a property right belonging to the plaintiff. The allegations of the first amended complaint, however, do not identify any property over which the law firm, or any of its employees, exerted control. Instead, Rikuo Kotsu alleges the firm aided and abetted Lee in the sale of a Learjet belonging to Rikuo Kotsu, the proceeds of which Lee then used to pay the fees of Carlsmith Ball.

---

[4]  We do not address the overlap between Civil Code section 1714.10 and cases applying the agent's immunity rule because Rikuo Kotsu did not plead conspiracy and did not seek court review under section 1714.10. As discussed in *Favila v. Katten Muchin Rosenman LLP, supra,* 188 Cal.App.4th at pages 206 to 210, the potential application of section 1714.10 has no impact on our decision in this case.

12

There was no assertion of a property right over the Learjet by Carlsmith Ball, and, consequently, any aiding and abetting claim is foreclosed by the agent's immunity rule.

The crux of Rikuo Kotsu's conversion claim is that the lawyers should have anticipated a court might impose an equitable lien on the proceeds of the jet sale, thus making the firm's acceptance of the fees paid with those proceeds subject to the putative lien. The cases cited by Rikuo Kotsu to support its cause of action, however, actually illustrate the flaw in its reasoning: Two of the cases, *Miller v. Rau* (1963) 216 Cal.App.2d 68, which imposed liability for conversion on a lawyer who held funds for a client he knew owed the money to a joint venture, and *Kaiser Foundation Health Plan, Inc. v. Aguiluz* (1996) 47 Cal.App.4th 302 (disapproved on another ground in *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 775, fn. 6), which held an attorney's negotiations in attempting to settle an insurer's reimbursement claims created an equitable lien on proceeds received from third party tortfeasors, were vigorously criticized by the third case, *Farmers Ins. Exchange v. Smith* (1999) 71 Cal.App.4th 660. In *Farmers* the plaintiff insurance companies sued an attorney for conversion after he disbursed settlement proceeds received by his clients notwithstanding policy provisions that allowed for reimbursement of payments made by the insurer if the insured later recovered from a third party, an issue Justice Sills of Division Three of the Fourth District characterized as "whether an insurer can, in effect, press-gang a policyholder's personal injury attorney into service as a collection agent when the policyholder receives medical payments from the insurer and then later recovers from a third party tortfeasor." (*Id.* at p. 662.) Justice Sills colorfully suggested the *Miller* and *Aguiluz* line of decisions cited by Rikuo Kotsu here had "assumed the existence of an equitable lien from the beginning, as if it were a piece of gum stuck on a dollar bill." (*Id.* at p. 667.)

As the *Farmers* decision explained, "[a]n equitable lien is, after all, merely an equitable remedy which is available to accomplish justice in a given situation. The central but unstated premise on which the *Aguiluz* decision [which followed *Miller*] was based is that there is a per se rule that property in an attorney's control, which is *known* to

13

be someone else's (like an earmarked dollar bill), fastens the attorney with a duty as a matter of equity to see to it that the property goes to its rightful owner, regardless of the attorney's obligations to his or her client or the attorney's right to be paid." (*Farmers Ins. Exchange v. Smith, supra,* 71 Cal.App.4th at pp. 667-668.) Finding no basis to infer an equitable lien in favor of the plaintiff insurance companies, the court rejected the attempt to recover money from the insureds' attorney "based on a sticky gum theory of equitable liens" that assumes a portion of the proceeds paid by the tortfeasors are "already . . . *owned* by the insurer[s]." (*Id.* at p. 671.) The court reasoned, "An insurer does not detrimentally rely on anything when it makes first party medical payments to one of its policyholders as a result of an auto accident. It is just doing what it contracted to do. Nor is a policyholder's *attorney* unjustly enriched when he or she remits money to the client that the client is *entitled to* under the attorney-client agreement. The contractual relationship created by an insurance policy is between the insurer and the insured, not the insured's attorney. The simple fact that an insurance policy obligates the *policyholder* to reimburse the insurer for first party medical payments later recovered from a third party does not create an independent obligation on the part of the insured's *attorney* to 'insure'—for want of a better word—that the client lives up to his or her obligation. The attorney is not the client's keeper." (*Id.* at p. 662; accord, *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 272-274 [following *Farmers*; insurer must interplead itself into the original action to assert subrogation rights].)

The same principle applies here. Whether Rikuo Kotsu owned the jet and was thus entitled to the proceeds of the sale was an issue in the underlying litigation. At the time of sale Rikuo Kotsu did not hold a judicially acknowledged right to seize the proceeds from the sale. Carlsmith Ball, which provided legal services to Lee and RC to effect the sale, did not take possession of the proceeds from the sale. Instead, Lee used those proceeds to pay the firm its outstanding attorney fees and costs. Carlsmith Ball and Tatsugi owed no duty to turn around and repay those sums to the parent corporation.

14

**DISPOSITION**

The judgment of dismissal is affirmed.  Carlsmith Ball and Tatsugi are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.