Filed 11/4/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JEAN SPRENGEL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GREGORY ZBYLUT, et al.,<br><br>Defendants and Respondents. | B282129<br><br>(Los Angeles County<br>Super. Ct. No. BC535584)<br><br>**ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT)** |

THE COURT:

IT IS ORDERED that the opinion filed September 10, 2019, modified on September 17, 2019 be corrected as follows:

1. Page 1 third paragraph, attorneys for Defendant and Respondent Gregory Zbylut, Miller Law Associates, Zachary Mayer shall include **Lisa D. Mallinson**

_____

PERLUSS, P. J.,                ZELON, J.,                SEGAL, J.

Filed 9/10/19 (unmodified opn. attached); Ordered Published 10/7/19 (order attached); Nonpub. opn. modified 9/17/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JEAN SPRENGEL, | B282129 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC535584) |
| GREGORY ZBYLUT, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Allen White, Judge.  Affirmed.

Knez Law Group and Fred J. Knez, for Plaintiff and Appellant.

Miller Law Associates, Randall A. Miller, Lisa D. Mallinson and Amy A. Breyer for Defendant and Respondent Gregory A. Zbylut.

Nemecek & Cole, Michael McCarthy, Mark Schaeffer and Tammy Q. Gallardo, for Defendants and Respondents Vincent Cox and Leopold, Petrich & Smith.

_____

Jean Sprengel and Lanette Mohr established "Purposeful Press LLC" to market a guidebook that Sprengel had written about the side effects of chemotherapy. After a management dispute arose between them, Sprengel filed an action to dissolve the company, and a separate action alleging that Mohr had infringed her copyrights to the guidebook. Mohr, acting in her representative capacity as the manager of Purposeful Press, retained Gregory Zbylut, Vincent Cox and Cox's firm, Leopold, Petrich & Smith (LPS), to advise the company with respect to Sprengel's copyright claims and various other issues.

After the dissolution and copyright suits were resolved, Sprengel filed a malpractice action against Zbylut, Cox and LPS alleging they had violated their professional duties by undertaking representation of Purposeful Press without her consent, and rendering legal advice in the underlying lawsuits that was adverse to her interests.

Defendants filed motions for summary judgment arguing that their representation of Purposeful Press did not create an attorney-client relationship with Sprengel in her individual capacity. Sprengel, however, argued that defendants owed her a professional duty of care based on her status as a 50 percent shareholder of Purposeful Press. The trial court granted the motions, and entered judgments in defendants' favor. We affirm.

**FACTUAL BACKGROUND**
### A. Formation of Purposeful Press
In 2008, Jean Sprengel and Lanette Mohr agreed to form a limited liability company to adapt and market "Kaye's Chemo Book," a guidebook Sprengel had written about treating the side

effects of chemotherapy.[1]  Sprengel and Mohr retained Kenneth Stream to assist them in forming the corporation, which they named Purposeful Press.

Purposeful Press's operating agreement stated that Sprengel and Mohr were each 50 percent owners of the company, and that neither of them had "the authority to bind the Company without the consent and/or approval of the other."  The agreement further provided that Sprengel would make an initial investment of $5,000 in the company, and that Mohr would provide "organizational and business planning services with an agreed-upon value of $5,000."  The agreement identified Mohr as "the sole manager of the company," which authorized her to "Keep the books and records of the Company; "Open bank accounts in the name of the Company"; "Execute instruments and documents"; and "do and perform all other acts as may be necessary or appropriate to the conduct of the Company's Business."  Sprengel and Mohr were not entitled to any compensation from the company other than equal profit distributions.

Acting pursuant to her role as manager, Mohr negotiated a deal with Merck Pharmaceuticals to produce a commercialized version of "Kaye's Chemo Book."  During 2008 and 2009, Mohr and Sprengel worked to transform the original work into two commercial guidebooks named the "ChemoCompanion Care Guide" and the "ChemoCompanion Pocket Guide" (collectively the ChemoCompanion guides).

---

[1]  This is the second appeal in this matter.  In *Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, we affirmed the trial court's order denying defendants' special motion to strike brought pursuant to Code of Civil Procedure section 425.16.

4

### B. Sprengel and Mohr's Management Disputes

In December 2010, Mohr informed Sprengel she could not continue to serve as manager unless she began receiving a salary. In response, Sprengel told Mohr she was willing to take over managerial duties, and requested that Mohr turn over the corporate records. Mohr, however, retained the records, and began to exclude Sprengel from discussions about Purposeful Press's business operations. Sprengel monitored Purposeful Press's checking account, and became concerned Mohr was using corporate funds to pay for personal expenses. That same month, Rosen contacted defendant Gregory Zbylut about representing Purposeful Press. According to Zbylut's declaration, during their initial consultation, Mohr told him she and Sprengel were in a dispute regarding Mohr's compensation and business expenditures. Mohr then retained Zbylut to prepare Purposeful Press's tax filings and K-1 forms.

In August 2011, Mohr and Rosen met with Vincent Cox to discuss representation of Purposeful Press regarding the company's intellectual property. According to Cox's declaration, Mohr told him that Sprengel had threatened to terminate Purposeful Press's right to sell the ChemoCompanion guides. Cox and Mohr then spoke at length about the history of Purposeful Press, and the ChemoCompanion guides. Mohr and Cox signed a retainer agreement stating that Cox's firm, Leopold Petrich & Smith (LPS), would provide Purposeful Press legal services regarding the "[c]onfirmation of client's intellectual property rights in certain published and unpublished works." Based on his discussions with Mohr and his review of Purposeful Press's operation agreement, Cox formed the belief that Sprengel and Mohr had received "incorrect and incomplete legal advice by

Mr. Stream" regarding the company's ownership of the copyrights to the ChemoCompanion guides.

On September 16, 2011, Cox sent a letter to Sprengel's personal attorney, Michael Kerbs, stating that Purposeful Press had retained LPS "in connection with its intellectual property rights." The letter acknowledged the dispute between Sprengel and Mohr, and asserted that Purposeful Press had the right to continue marketing and selling the ChemoCompanion guides, and develop other derivative works. The letter also cautioned Sprengel against pursuing legal action, asserting that any such litigation would be costly for herself and the company.

Immediately after learning that Mohr had retained Zbylut and LPS to represent Purposeful Press, Sprengel withdrew $162,000 from the company's bank account, and deposited the funds into a trust account maintained by her attorney. Sprengel asserted that the transfer was necessary "to prevent future improper expenditure[s]," and notified Mohr she could seek repayment "for any appropriate business expenses."

Sprengel also sent Mohr a letter stating that she was revoking any implied copyright license she had granted to Purposeful Press to exploit "Kaye's Chemo Guide." Shortly after receiving the letter, Cox and LPS assisted Mohr in preparing a copyright registration for the ChemoCompanion guides that listed herself, Sprengel and Purposeful Press as claimants.

### C. Sprengel's Filing of the Dissolution and Copyright Actions

In September 2011, Sprengel filed an involuntary dissolution action against Mohr and Purposeful Press. The complaint alleged Purposeful Press could no longer carry out its duties "in conformity with the . . . Operating Agreement" because

6

the "management of the company [had become] deadlocked or subject to internal dissension."

Sprengel also filed a federal copyright infringement action against Mohr asserting that she owned the copyright to the Kay Chemo Guide and the derivative ChemoCompanion guides. The complaint alleged that although Sprengel had initially granted Purposeful Press an implied license to sell the original and derivative works, she had subsequently revoked the license. The complaint further alleged that Mohr, acting through Purposeful Press, had continued to market and sell the works, despite Sprengel's revocation of the license.

After the suits were filed, Cox and Mohr signed an amendment to the Purposeful Press retainer agreement that expanded the scope of LPS's legal services to include pursuing a declaratory relief action regarding the company's "rights in its intellectual property," and filing claims against Sprengel for unlawfully transferring funds from Purposeful Press's bank accounts.

### D. The Federal Copyright Proceedings
#### 1. Mohr's motion to disqualify counsel for Purposeful Press

In the copyright action, Mohr requested that Purposeful Press be joined in the proceedings as a necessary party. (See Fed. Rules Civ. Proc., rule 19). In response, Sprengel filed an amended complaint naming Purposeful Press as a nominal defendant, and retained Thomas Foley to serve as the "neutral" company attorney. Mohr filed a motion to disqualify Foley, asserting that Sprengel had no authority to select the company's attorney.

7

The district court granted the motion, concluding that because Sprengel and Mohr were both 50 percent owners of the company, conflict of interest principles precluded either of them from unilaterally selecting corporate counsel: "[U]nder California law an attorney-client relationship arguably has been formed between . . . Foley and Sprengel in her representative capacity as a member of the Company. Given the dispute between Sprengel and Mohr, it is not clear that . . . Foley as counsel for the Company adequately can represent the interests of all members in the Company – i.e., Sprengel and Mohr. . . . Foley presumably has been compensated by Sprengel. . . . It very well may be that . . . Foley would be able to maintain his independence of professional judgment. But his representation of the Company still would interfere with the attorney-client relationship between him and each of the parties in their representative capacity as a member of the Company. And, to the extent Mohr can be considered [] Foley's 'client' (again, through her 50% membership interest in the Company), she does not consent to [] Foley's representation." (*Sprengel v. Mohr* (C.D. Cal., May 30, 2012, No. CV 11-8742 (2012 WL 12886207, at *2.)

The court further explained that the company did not appear to need counsel because it had no discernible "interest independent of its owners." The court advised, however, that if "a legitimate need were to arise for the Company to . . . actively participate in this action, the parties [could] stipulate to the appointment of independent counsel."

### 2. *The parties' discovery disputes*

Sprengel served Mohr with discovery requests seeking any communications Mohr had with Zbylut, Cox or LPS regarding Purposeful Press. Mohr objected to the requests based on

8

attorney-client privilege.  Sprengel brought a motion to compel arguing that Mohr was not authorized to invoke the company's privilege against the other 50 percent owner of the company.

After reviewing California authorities, the district court concluded that a corporation's privilege "can be asserted or waived only by [current] management."  (*Sprengel v. Mohr* (C.D. Cal., Sept. 14, 2012, No. CV 11-8742) 2012 WL 12885115, at *4.) The court then analyzed who qualified as Purposeful Press's management for purposes of asserting the privilege: "Although Mohr is the sole manager, the Operating Agreement . . . does not provide that Mohr will have total control of the Company of which she is only a 50 percent owner.  On the contrary, the [Agreement] states that the business of the Company shall be managed by the members, and that no member has the authority to bind the Company without the approval of the other member. . . .  In short, Sprengel is as much a controlling member – is as much 'current management'–of the Company as Mohr." (*Ibid*.)

The court further held that "where, as here, the LLC is owned and managed by two coequal members, neither can assert the LLC's privilege against the other.  Accordingly, Mohr cannot assert the attorney-client privilege on behalf of the Company here against Sprengel."

### 3. *The district court's ruling in the copyright action*

In February 2013, the district court issued its findings of fact and conclusions of law in the copyright action.  The court found Sprengel owned the copyrights to both the Kay Chemo Guide and the ChemoCompanion guides.  The court further found, however, that Sprengel had granted Mohr and Purposeful Press an implied license to exploit those copyrights, which

9

provided a complete defense to Sprengel's infringement claims. The court also found that Mohr and Purposeful Press needed Sprengel's authorization to "develop [any] additional derivative works that incorporate protected elements of the [original works]."

### E. The Current Malpractice Action
#### 1. Summary of the Complaint

In September 2013, Sprengel filed the current lawsuit against Zbylut, Cox and LPS. The complaint alleged that when Mohr retained the defendants to represent Purposeful Press, there was an understanding that they would "provide legal services for the benefit of Mohr, and to the prejudice of [Sprengel], under the pretext that the legal services were for the benefit of the [c]ompany." The complaint further alleged that defendants had "solicited payment from the [c]ompany for their legal services in conjunction with the [d]issolution [c]ase and the [c]opyright [c]ase without [Sprengel's] knowledge or consent. The legal services provided by [d]efendants in the [d]issolution [c]ase and the [c]opyright [c]ase were primarily devoted to the best interests of Mohr and assisting [Mohr's attorney Rosen] in his representation of Mohr in those cases, at the [c]ompany's expense."

Sprengel alleged four causes of action: (1) professional negligence (malpractice); (2) breach of fiduciary duties; (3) constructive fraud; and (4) "common count for money had and received." In the negligence claim, Sprengel asserted that "[b]y undertaking to provide legal services and soliciting payment from [Purposeful Press] in the [dissolution and copyright cases], [d]efendants became obligated to [Sprengel] to exercise reasonable care and skill with the standard of care for

10

attorneys. . . ." She further alleged defendants had breached those professional obligations by "fail[ing] to communicate with [Sprengel] and inform [her] of material facts and information relating to the legal services provided and charged to [Purposeful Press]," and "violat[ing] Rules of Professional Responsibility governing . . . conflicts of interest including the failure to obtain written waivers from [Sprengel] and Mohr."

Sprengel's claim for breach of fiduciary duty similarly alleged that "by undertaking to provide legal services regarding the affairs of [Purposeful Press] including the disputes between the [c]ompany's two 50 percent owners and causing the [c]ompany to pay for those legal services, a fiduciary relationship existed between [Sprengel] and [d]efendants such that [d]efendants owed to [Sprengel] the duties of honesty, good faith, undivided loyalty and full disclosure of material facts . . . and were obligated to comply with all of the Rules of Professional Conduct. . . ." Defendants allegedly breached their fiduciary duties by "concealing a conflict of interest," failing to obtain Sprengel's consent for payment of legal services and charging Purposeful Press for legal services "calculated to benefit the interests of Mohr and prejudice [Sprengel]."

Sprengel's third and fourth claims for constructive fraud and "common count for money had and received" were similarly based on defendants' alleged breach of professional duties they owed to Sprengel.

### 2. The summary judgment proceedings
#### a. The defendants' motions and supporting evidence

Zbylut and the LPS defendants (Cox and LPS) filed motions for summary judgment arguing that there were two reasons Sprengel's claims failed as a matter of law. First, the LPS

11

defendants contended that Sprengel lacked standing to pursue her claims in a direct action because Purposeful Press "[wa]s the real party in interest." More specifically, the LPS defendants asserted the allegations in Sprengel's complaint showed she was seeking reimbursement of the funds Purposeful Press had paid to defendants, claiming that those fees should be disgorged because: (1) she had not consented to the legal services, as was required under the operating agreement; and (2) the services were intended to benefit Mohr, rather than the company. According to defendants, these claims had to be brought as a derivative action rather than a direct action because they effectively sought recovery of the company's assets.

Second, both defendants argued that "[a]ll of Sprengel's claims" were predicated on "the existence of an attorney-client relationship between her and [defendants]." Defendants asserted, however, that under "California law[,] . . . an attorney for a corporate entity does not owe a duty of care to the company's members by virtue of representing the company." Thus, Sprengel's status as a 50 percent owner of Purposeful Press was, standing alone, insufficient to establish an attorney-client relationship.

Zbylut, Cox and Mohr provided declarations in support of the motions clarifying that Mohr had retained the defendants to represent Purposeful Press, and retained separate counsel (Rosen) to represent her in her individual capacity. Zbylut and Cox's declarations described the nature of the work they had performed for the company. Zbylut asserted his work had consisted solely of tax preparation services, while Cox stated that he had provided advice regarding Purposeful Press's copyright

interests to the chemotherapy guidebooks.  Both defendants asserted they had never spoken directly with Sprengel.

### b. *Sprengel's opposition and supporting evidence*

Sprengel's opposition argued that, by undertaking representation of a corporate entity comprised of two 50 percent owners, the defendants necessarily entered into an implied attorney-client relationship with each of the owners in their individual capacities.  Sprengel further asserted that as a result of her implied attorney-client relationship with defendants, they were required to obtain her consent prior to performing any legal services on behalf of Purposeful Press, and were precluded from taking any legal positions that were adverse to her personal interests.  Sprengel contended defendants had violated those obligations by accepting payment from Purposeful Press without obtaining her consent, and advising Mohr with respect to Sprengel's claims in the dissolution and copyright actions.[2]

Sprengel did not directly address the LPS defendants' contention that her claims were derivative in nature, meaning she lacked standing to assert her claims in a direct action.  Although Sprengel argued she had "standing" based on her implied attorney-client relationship with the defendants, she did not explain why her claims were direct, rather than derivative, nor did she identify any harms she had suffered in her individual capacity.

---

[2]    Sprengel's opposition also argued the defendants were collaterally estopped from denying the existence of an attorney-client relationship based on the district court's orders in the federal copyright action.  The trial court rejected Sprengel's estoppel argument, and Sprengel has not challenged that portion of the ruling in this appeal.

In support of her opposition, Sprengel provided declarations asserting that Mohr had not obtained her consent prior to hiring defendants to represent Purposeful Press, and that she had never spoken with defendants regarding their representation of the company. Sprengel further asserted that after learning of defendants' retention, she transferred Purposeful Press's funds out of its bank account so that no further payments could be made to them.

### 3. *The trial court's ruling*

In February 2017, the court issued orders granting defendants' motions for summary judgment. The court agreed that Sprengel lacked standing because her claims were derivative, rather than individual, in nature. In its analysis, the court explained that Sprengel's claims were predicated on the theory that "the use of Company funds to pay for Defendants' legal services was, in essence, using Plaintiff's money to pay for such services." The court further explained that the members of a limited liability company do not hold any "direct ownership interest in the company's assets, [and are not] . . . directly injured when the company is improperly deprived of those assets." Thus, the court continued, "the use of Company funds . . . to pay for Defendants' legal services . . . did not cause Plaintiff direct financial injury. Instead, such injury would be derivative. . . . [¶] . . . [¶] As such, Plaintiff does not have standing to assert any of the causes of action as [a] direct claim."

The court also found Sprengel had failed to establish any triable issue of fact regarding the existence of an attorney-client relationship between herself and defendants. The court concluded that under California law, defendants' representation

14

of Purposeful Press did not, standing alone, give rise to a professional duty of care toward Sprengel.

## DISCUSSION

Sprengel argues the trial court erred in concluding that she lacked standing to bring her claims as a direct action, and that she failed to identify any evidence that would support a finding of an attorney-client relationship between herself and defendants.

### A. *Summary Judgment and Standard of Review*

"'Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citation.]. . . . [¶] Our review is de novo. [Citation.] We liberally construe the opposing party's evidence and resolve all doubts in favor of the opposing party. [Citation.] We consider all evidence in the moving and opposition papers, except that to which objections were properly sustained.' [Citation.]" (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418; 246 Cal.Rptr.3d 161, 171-172.)

### B. *Sprengel Does Not Dispute She Lacks Standing to Seek Reimbursement of Purposeful Press's Funds*

The trial court concluded Sprengel was required to bring her claims as a derivative, rather than a direct, action because the allegations in her complaint demonstrated she was seeking redress for injuries to Purposeful Press, rather than for any injury she had suffered in her individual capacity. More specifically, the Court found Sprengel was seeking reimbursement of the fees Purposeful Press had paid to defendants for their legal services.

15

"Because a corporation exists as a separate legal entity, the shareholders have no direct cause of action or right of recovery against those who have harmed it.  The shareholders may, however, bring a derivative suit to enforce the corporation's rights and redress its injuries when the [corporation] fails or refuses to do so." (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.)  "An action is deemed derivative '"if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets."' [Citation.]" (*Ibid.* [fn. Omitted].)  "A personal claim, in contrast, asserts a right against the corporation which the shareholder possesses as an individual apart from the corporate entity:  'If the injury is not incidental to an injury to the corporation, an individual cause of action exists.' [Citation.]" (*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1222 (*Denevi*).)  "[T]he principles of derivative lawsuits applicable to corporations likewise apply to a limited liability compan[ies]." (*PacLink Communications Intern., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 (*PacLink*).)

Sprengel's appellate briefing does not challenge the court's conclusion that she cannot bring a direct action to recover the corporate funds that Purposeful Press paid to defendants for their legal services.  This apparent concession is well taken.  Claims seeking to recover corporate assets from a third party are generally deemed to be derivative in nature.  (*PacLink, supra,* 90 Cal.App.4th at p. 964 [claim alleging LLC had been "improperly deprived of . . . assets," causing a "diminution in the value of [individual member's] interest" was derivative]; see also Marsh et

16

al., Marsh's Cal. Corp. Law (4th ed. 2000) § 15.11[A][1], pp. 15-61, 64.) Thus, to the extent defendants unlawfully solicited and accepted payment from Purposeful Press for legal services that were not authorized by the company's management, or were otherwise intended to benefit Mohr in her personal capacity, a derivative action is the appropriate remedy.

Sprengel disputes, however, the trial court's finding that the only form of injury she has alleged in this case consists of "fraudulent use of Company funds for [payment of legal services intended for] Mohr's benefit." According to Sprengel, her claims also allege defendants breached their duty of loyalty to her by providing advice and counsel to Mohr regarding the company's use of Sprengel's copyrights to the chemotherapy guidebooks, which forced Sprengel to expend funds to litigate the copyright and dissolution actions. Stated more simply, Sprengel contends the legal services defendants provided to Mohr forced her to incur expenses to defend her personal copyrights.

Although Sprengel's complaint does not expressly identify the expenses she incurred in litigating the underlying actions as a form of damages, those claims are fairly implied from her pleadings and the materials she submitted in opposition to the motions for summary judgment. Sprengel's complaint repeatedly asserts that, by providing legal services "in conjunction with the [d]issolution [c]ase and the [c]opyright [c]ase," defendants breached their duty of loyalty to Sprengel, and violated their duty to avoid conflicts of interest. The declarations Sprengel provided in the summary judgment proceedings further assert that, as a result of defendants' conduct, she was "forced to retain attorneys and incur fees and costs." These allegations make clear that

17

Sprengel is seeking redress for the fees that defendants allegedly caused her to incur in defending her copyrights.

It is also clear that this form of injury is personal, rather than derivative, because it involves rights that Sprengel allegedly possessed as "an individual apart from the corporate entity." (*Denevi, supra*, 121 Cal.App.4th at p. 1222.)  Specifically, she alleges that as a result of the defendants' breach of their professional duties, she was forced to defend copyrights she owned in her personal capacity.

### C. Sprengel Has Presented No Evidence that Would Support a Finding of an Implied Attorney-Client Relationship

Sprengel acknowledges that, to prevail on the aspects of her claims that she has standing to pursue, she must establish the existence of an attorney-client relationship between herself and defendants.  She further concedes that she never entered into an express agreement with any of the defendants.  She contends, however, that an "implied" attorney-client relationship existed between herself and defendants based on her status as a 50 percent owner of Purposeful Press.

The existence of an attorney-client relationship involves a question of law that we review de novo.  However, any conflict in the evidence of an attorney-client relationship is a question of fact for the trial court to decide, which we uphold if supported by substantial evidence.  (See *Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1733 (*Responsible Citizens*); *Meehan v. Hopps* (1956) 144 Cal.App.2d 284, 287 (*Meehan*.)

18

*1. Summary of applicable law*
  *a. General rule of no duty to shareholders*

Generally, when "representing a corporation, an attorney's client is the corporate entity, not individual shareholders or directors, and the individual shareholders or directors cannot presume that corporate counsel is protecting their interests." (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 784.) "An attorney representing a corporation does not become the representative of its stockholders merely because the attorney's actions on behalf of the corporation also benefit the stockholders; as attorney for the corporation, counsel's first duty is to the corporation." (*Skarbrevik v. Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 703 (*Skarbrevik*); see also *Meehan, supra,* 144 Cal.App.2d at p. 290 ["The attorney for a corporation represents the corporation. . . . He in nowise represents the officers personally"]).)

These principles are reflected in California's Rules of Professional Conduct, former Rule 3-600, which governed the representation of an organization at the time the events at issue in this case occurred. (See Cal. Rules of Prof. Conduct, former Rule 3-600 [effective September 14, 1992 to October 31, 2018].)[3] Subdivision (A) of former Rule 3-600 provided, in relevant part: "In representing an organization, a [lawyer] shall conform his or her representation to the concept that the client is the

---

[3]     During the pendency of this appeal, the Supreme Court approved new Rules of Professional Conduct. The current rule governing the representation of an organization, Rule 1.13, contains language that is substantially identical to the subdivisions of former Rule 3-600 that we cite here. (See Cal. Rules of Prof. Conduct, Rule 1.13(a) and (f).)

19

organization itself . . . ." Subdivision (D) further provided that, "In dealing with an organization's directors, officers, employees, members, shareholders, or other constituents, a [lawyer] shall explain the identity of the client for whom the [lawyer] acts, whenever it is or becomes apparent that the organization's interests are or may become adverse to those of the constituent(s) with whom the [lawyer] is dealing."

In *Skarbrevik, supra*, 231 Cal.App.3d 692, the court applied these principles in concluding that a corporate attorney owed no professional duty to a minority shareholder who claimed that the value of his shares had been fraudulently diluted. The evidence at trial showed the majority shareholders had initially agreed to purchase plaintiff's 25 percent share of the company for $500,000. Several months later, however, the majority shareholders refused to make the payment, asserting that the company's attorney had advised them they were not legally required to make the payment. The attorney then advised the majority shareholders with respect to a stock issuance plan that substantially diluted the value of plaintiff's ownership interest. A jury found the attorney and his law firm had breached their professional duties to the plaintiff.

The appellate court reversed, explaining that a "corporate counsel's direct duty is to the client corporation, not to the shareholders individually, even though the legal advice rendered to the corporation may affect the shareholders." (*Skarbrevik, supra*, 231 Cal.App.3d at p. 704.) The court acknowledged case law from other jurisdictions holding that an attorney for a closely-held corporation may owe professional duties to individual owners with whom he or she has had "close interaction." (*Id.* at p. 705.)

20

The court concluded, however, that no such interaction had occurred in the current case.  Instead, the evidence showed the plaintiff had "no contact" with the corporate attorney, and had no "basis . . . to place faith, confidence or trust in [the attorney] to protect his interests . . ., particularly after he was told . . . [the] attorney[ had] advi[sed the majority shareholders] . . . not to pay him for his shares."  (*Skarbrevik, supra*, 231 Cal.App.3d at p. 705.)  The court further explained that "[t]he fact that the [attorney] could have foreseen the adverse consequences of his advice and its impact on plaintiff [was] not sufficient justification for fixing liability on him to a nonclient shareholder under these circumstances."  (*Id*. at p. 707.)

### b. *Case law addressing implied attorney-client relationships in the context of partnerships*

In *Responsible Citizens, supra,* 16 Cal.App.4th 1717, the court held that, at least under some circumstances, an attorney's representation of a partnership may create an implied attorney-client relationship with the individual partners.  The defendant in *Responsible Citizens* sought to disqualify the plaintiff's attorney because the attorney had previously represented the defendant's partnership in an unrelated matter.  The trial court granted the disqualification order "based on . . . the legal conclusion that representation of a partnership automatically creates an attorney-client relationship with the individual partners."  (*Id*. at p. 1721.)

The appellate court reversed, concluding that the trial court had erred in finding that an attorney's representation of a partnership "necessarily includes representation of the individual partners."  (*Responsible Citizens, supra*, 16 Cal.App.4th at p. 1735.)  The court further held, however, that an attorney for a

21

partnership may, through his or her conduct, enter into an "implied" attorney-client relationship to represent the interests of the individual partners. (*Id.* at p. 1732.) The court set forth a "[non]exhaustive" list of "factors which might support, or undercut, implication of an attorney-client relationship with an individual partner in any particular case. The type and size of the partnership obviously have a bearing. . . . So do the nature and scope of the attorney's engagement by the partnership. The kind and extent of contacts, if any, between the attorney and the individual partner might be important factors. The same is true as to the attorney's access to information (e.g., partnership financial information) relating to the individual partner's interests." (*Id.* at p. 1733.)

The court emphasized that "primary attention should be given to whether the totality of the circumstances, including the parties' conduct, implies an agreement by the partnership attorney not to accept other representations adverse to the individual partner's personal interests." (*Responsible Citizens, supra,* 16 Cal.App.4th at p. 1733.) The court remanded the matter with directions that the trial court weigh those factors in assessing whether an implied attorney-client relationship had been formed.

In *Johnson v. Superior Court* (1995) 38 Cal.App.4th 463 (*Johnson*), the court applied *Responsible Citizens's* multi-factor test in assessing whether there was sufficient evidence to support a finding that the attorney for a partnership had an implied attorney-client relationship with each of the partners. The partnership at issue in *Johnson* owned a single asset that consisted of a lease to an industrial park. During the lease period, the general partner, acting on behalf of the partnership,

entered into an option to purchase the property from the landowner on terms that were beneficial to the partnership. Shortly thereafter, the general partner sent the limited partners a letter stating that they needed to contribute additional capital to the partnership, or, alternatively, sell their interest back to the partnership. The letter did not disclose the partnership's option agreement with the landowner.

The general partner retained the defendant attorney to advise him and the partnership whether any additional disclosures had to be made to the limited partners regarding the option to purchase the land. The attorney drafted a second letter informing the limited partners that they were required to either provide additional capital, or accept the general partner's buyout proposal. The general partner sent the letter out on his letterhead; there was no indication that the letter had been prepared or reviewed by the defendant. The limited partners elected to sell their partnership interests back to the general partner; the general partner then executed the option to purchase the property, and subsequently resold the property for a substantial profit.

The limited partners filed suit against the general partner and the attorney for failing to disclose the land purchase agreement. The attorney moved for summary judgment, arguing that he had been retained to represent the general partner and partnership, and had no attorney-client relationship with the limited partners. The trial court granted the motion, noting that there was no express agreement to represent the plaintiffs, and that plaintiffs had never had ever had any contact with the defendant, or otherwise relied on his advice.

The appellate court reversed, concluding there were triable issues of fact whether the plaintiffs and defendant had an implied attorney-client relationship. The court acknowledged that several of the factors set forth in *Responsible Citizens* weighed against an attorney-client relationship. Specifically, the evidence showed the limited partners had not had any contact with the attorney, they had not directly relied on the attorney's advice and had no prior relationship with him. Moreover, there was no evidence the attorney had access to any confidential information regarding the partner's individual finances, or their desire to remain in the partnership.

The court concluded, however, that other factors nonetheless raised a triable issue of fact regarding the existence of an attorney-client relationship. First, the attorney knew the limited partners had no knowledge of the partnership's option to purchase the property. Second, the attorney also knew the limited partners were likely to rely on the letter he had drafted, and that the omission of material facts might affect their decision whether to sell their partnership interest. Third, the court found that the "primary factor" weighing in favor of an attorney-client relationship consisted of "the nature of representation that [the attorney] had rendered" to the partnership. (*Johnson, supra*, 38 Cal.App.4th at p. 478.) The court explained that the attorney had specifically been "retained to represent the partnership interests" with respect to the land sale. (*Ibid*.) The evidence indicated, however, that the attorney's actions were intended to benefit the general partner at the expense of the limited partners. As stated by the court, "This is a case, we are convinced, in which the undertaking by [the attorney] to represent the partnership, generally, imposed upon him an

24

obligation of loyalty to the partnership and to all partners in terms of their entitlement to benefits from the partnership. . . ." (*Id.* at p. 479.)

> 2. *Sprengel has presented no evidence that would support the finding of an implied attorney-client relationship*

Sprengel argues that, under the factors and analysis set forth in *Responsible Citizens*, there are triable issues of fact whether she had an implied attorney-client relationship with defendants based on their representation of Purposeful Press. Sprengel's argument relies primarily on the first factor set forth in *Responsible Citizens*, effectively asserting that defendants' decision to undertake representation of an LLC that was owned by two 50 percent shareholders necessarily gave rise to an individual client-attorney relationship with each of the two shareholders.

Defendants do not challenge *Responsible Citizens's* and *Johnson's* holdings that an implied attorney-client relationship may be formed between the attorney for a corporate entity and the entities' individual constituents.[4] They argue, however, that applying the factors set forth in those decisions, Sprengel has produced no evidence that would support a finding of an attorney-client relationship between herself and defendants. We agree.

---

[4] Although *Responsible Citizens* involved a partnership, the decision does not contain any language limiting its holding to partnerships, and substantial portions of the decision analyze corporations and partnerships interchangeably. (*Responsible Citizens, supra*, 16 Cal.App.4th at pp. 1726-1729.)

As Sprengel correctly notes, Purposeful Press's status as an entity comprised of only two 50 percent shareholders is a factor that weighs in support of an attorney-client relationship. (See also *Johnson*, *supra*, 38 at p. 476 ["The argument is that representation of [an entity with] few members may suggest an individual representation of the members"]; see also *Woods v. Superior Court* (1983) 149 Cal.App.3d 931, 936 ["the attorney of a . . . business [owned by a husband and a wife] . . . should not represent one owner against the other in a dissolution action"].) Several other factors, however, clearly "undercut the implication" of an implied attorney-client relationship between Sprengel and defendant. (*Responsible Citizens, supra*, 16 Cal.App.4th at p. 1733.)

First, it is important to clarify the nature of the implied attorney-client relationship that Sprengel alleges she formed with defendants. Unlike in *Johnson*, Sprengel is not merely asserting that, as attorneys for Purposeful Press, defendants had a professional duty to protect the individual interests and benefits she held in Purposeful Press as a shareholder. (Compare *Johnson, supra*, 38 Cal.App.4th at p. 479 ["the undertaking . . . to represent the partnership, generally, imposed [the attorney] . . . an obligation of loyalty to . . . all partners in terms of their entitlement to benefits from the partnership. . . ."].) Indeed, aside from the derivative claims that seek recovery of the corporate funds defendants received from Purposeful Press, which Sprengel lacks standing to pursue (see *ante*, pp. 14-16), Sprengel has not identified any harm that defendants' representation of Purposeful Press is alleged to have caused to her in her representative capacity as a shareholder.

26

She does not assert, for example, that defendants aided Mohr in devaluing her share of the company, or otherwise negatively affected any benefits she derived from Purposeful Press.[5]  Instead, Sprengel alleges defendants caused harm to personal interests that she held separate from the corporation, and that were adverse to the corporation.  Specifically, she alleges defendants breached their duty of loyalty by assisting Mohr and Purposeful Press in claiming ownership over copyrights that Sprengel owned in her personal capacity, causing her to expend funds to defend those personally-held copyrights. Sprengel has cited no authority suggesting that, standing alone, an attorney's representation of a closely-held corporation gives rise to professional duties to the individual shareholders with respect to personally-held rights that are both separate from, and adverse to, the corporation itself.

Second, even if there were circumstances under which a corporate attorney might owe such a duty to individual shareholders, no such circumstances are present here.  When

---

[5]   Sprengel's appellate briefing contends there is evidence that defendants aided Mohr in attempting to "force" Sprengel out of the company.  The only evidence she cites in support of that claim, however, is an email from Zbylut to Mohr's personal attorney confirming that the operating agreement contained no mechanism that permitted Sprengel or Mohr to unilaterally eject the other from the company.  The email proposed, however, that Mohr offer Sprengel the corporation's existing funds, then $162,000, in exchange for Sprengel's ownership interests in the company and the copyrights.  The contents of the email make clear Zbylut was simply proposing a potential settlement offer that could resolve the management dispute.  There is no evidence this proposal was ever acted upon, and Sprengel has not set forth any injury she suffered as a result of the proposal.

assessing the existence of an implied attorney-client relationship between a corporate attorney and the entity's individual members, the key inquiry is whether "the totality of the circumstances" implies an agreement that the corporate attorney will not act adversely to the individual shareholder's interests with respect to the issues in dispute. (*Responsible Citizens*, *supra*, 16 Cal.App.4th at p. 1733.) Stated differently, we must assess whether the parties conducted themselves in a way that would reasonably cause a shareholder to believe the attorney would protect the shareholder's individual interests. (See *Skarbrevik, supra,* 231 Cal.App.3d at p. 707.)

The evidence in this case demonstrates that Sprengel never believed, or had any reason to believe, defendants were acting to protect her personal interests, or had impliedly agreed to avoid representations that were adverse to those interests. Shortly after the LPS defendants agreed to represent Purposeful Press, they sent Sprengel's attorney a letter asserting that she was not the sole owner of the copyrights, and that she had no authority to unilaterally withdraw the company's right to publish the guidebooks. The attorneys made clear to Sprengel from the outset that their representation to her was adverse in nature.

Moreover, Sprengel's declarations assert that upon learning Mohr had retained defendants to represent Purposeful Press, she immediately transferred the company's assets out of its bank account to block any further payments to defendants. She then filed multiple lawsuits against Mohr in which she was represented by her own attorney. Sprengel's declarations confirm she never spoke with defendants directly, never relied on their legal advice and never shared any confidential information with

28

them.  Indeed, to the extent she had any interactions with defendants, those interactions were adversarial in nature.

This is simply not a case where the parties' conduct could be deemed to imply an agreement that defendants would not undertake representation that was adverse to Sprengel.  The adversarial nature of their relationship was clear from the time they were retained by Purposeful Press.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


ZELON, J.


We concur:



PERLUSS, P. J.



SEGAL, J.


29

Filed 9/17/19 (order modifying nonpub. opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JEAN SPRENGEL, | B282129 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC535584) |
| v. | |
| GREGORY ZBYLUT, et al., | **ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT)** |
| Defendants and Respondents. | |

THE COURT:

IT IS ORDERED that the opinion filed September 10, 2019 be corrected as follows:

2. Page 1 third paragraph, attorneys for Defendant and Respondent Gregory Zbylut, Miller Law Associates, **Zachary Mayer** shall replace Lisa D. Mallison.

3. Page 1 fourth paragraph, attorney Tammy Q. Gallardo of Nemecek & Cole shall be corrected to read **Tommy Q. Gallardo.**

_____

PERLUSS, P. J.,          ZELON, J.,          SEGAL, J.

Filed 10/7/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JEAN SPRENGEL,<br><br>    Plaintiff and Appellant,<br><br>     v.<br><br>GREGORY ZBYLUT, et al.,<br><br>    Defendants and Respondents. | B282129<br><br>(Los Angeles County<br>Super. Ct. No. BC535584)<br><br>**ORDER CERTIFIYING OPINION FOR PUBLICATION** |

THE COURT:

The opinion in this case filed September 10, 2019 and modified on September 17, 2019 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request by a non-party pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.,               ZELON, J.,               SEGAL, J.